IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In the Matter of: | ) | Case No. BK20-41195 |
| | ) | |
| JUSTIN DALE RAYMER and LINDA KAY RAYMER, | ) ) | Chapter 12 |
| | ) | |
| Debtors. | ) ) | |

**Order on Motions Regarding Cash Collateral**

This matter is before the court on debtors' motion to use cash collateral (Doc. #66) and objections thereto (Doc. #76; Doc. #78), and the motion of Security First Bank to require debtors to transfer cash collateral to the bank per 11 U.S.C. §§ 363(e) and 1205 (Doc. #55) and debtors' resistance thereto (Doc. #65). Trial was held on January 14, 2021 in Lincoln, Nebraska. Vincent Ledlow appeared for debtors Justin and Linda Raymer. David Pederson appeared for the bank. Richard Garden appeared for COG Marketers, Ltd. d/b/a AgroLiquid. Douglas Semisch appeared for the United States of America, on behalf of the United States Department of Agriculture, Farm Service Agency ("FSA") and on behalf of the United States Small Business Administration ("SBA").

Debtors request to use cash collateral to pay post-petition expenses through November 30, 2020, including $3,732 for household expenses and $77,797 for farm expenses. They also request to use cash collateral to pay monthly expenses until a plan is confirmed, including $3,660 per month for household expenses and $9,683 for farm expenses. (Doc. #66). Both motions are denied without prejudice.

*Findings of Fact*

1. Debtors filed this Chapter 12, case on September 8, 2020. (Doc. #1).

2. The bank filed Proof of Claim #1 as a secured claim of $2,684,059.65. It holds a lien encumbering real estate owned by the debtors, which may not exceed $1,473,500 plus interest as a first position lien. The bank also holds a first position lien on debtors' agricultural personal property including livestock, equipment, crops, feed, accounts, and proceeds. (Doc. #129, ¶ B, F, and I) (Proof of Claim #1).

3. AgroLiquid filed Proof of Claim #5 as a secured claim of $193,896.78. It holds a second position lien on debtors' agricultural personal property. (Doc. #129, ¶ C, J) (Proof of Claim #2).

4. FSA filed Proof of Claim #9 as a secured claim of $382,196.78. It holds a second position lien encumbering the real estate. (Doc. #129, ¶ D, G) (Proof of Claim #5).

5. The SBA filed Proof of Claim #8 as a secured claim of $151,294.52 on account of an Economic Injury Disaster Loan which debtors received in the summer of 2020. It holds a third position lien on debtors' equipment and accounts, which lien is subordinate to the liens of the bank and AgroLiquid. (Doc. #129, ¶ E, K, M) (Proof of Claim #8).

6. Debtors owe real estate taxes for 2019 and 2020 of approximately $48,000. The taxes are a lien against debtors' real estate, with priority over all other lien holders. (Doc. #129, ¶ H).

7. The objecting creditors are over-secured and entitled to post-petition interest and reasonable attorney fees as part of their claims. J.T. Korkow, debtors' financial consultant, calculated the objecting creditors were owed $49,000 in post-petition interest from the petition date to the date of the hearing.

8. Debtors did not apply for a farm operating loan for 2021 with conventional lenders. In Korkow's experience conventional lenders will not lend to debtors in bankruptcy and will not refinance the debt. Debtors also did not seek an operating loan from FSA. Korkow considered an FSA loan. He believed pre-existing liens made any new borrowing difficult.

9. The parties dispute the value of real estate collateral. Debtors value it at $2,153,216 and offered an appraisal prepared for FSA, with an effective date of August 22, 2019. (Doc. 84-12). Mr. Raymer thought this value was low, but did not offer specifics, other than his personal knowledge of the land.

10. The objecting creditors offered a second appraisal, prepared for debtors, with an effective date of November 24, 2020, which values the real estate at $1,970,000. (Doc. #125). The parties did not offer substantive evidence regarding differences in the appraisals or why one should be accepted over the other. The court adopts the November 24, 2020 appraisal for purposes of the motion given its proximity to the petition date and the motion to use cash collateral.

11. Merv Hilpipre, an auctioneer with over 70 years of experience, thoroughly inspected debtors' equipment and livestock. He valued all of debtors' equipment at $857,200, some of which was subject to purchase money security interests. (Doc. 127, Pg. 4). He valued the equipment subject to the objecting creditors' liens at $574,250. This valuation was largely undisputed. The court accepts Mr. Hilpipre's valuation of $574,250 for equipment.

12. Mr. Hilpipre valued the livestock at $949,800, including 465 cows at $672,600; 295 calves at $262,200; and 10 bulls at $15,000. (Doc. 172-4, Pg. 8). The parties disputed the value of the cows. The bank valued the cows at $506,000, for a total livestock value of $783,200. (Doc. 146, Pg. 7).

13. Hilpipre found the livestock to be of the highest quality he has seen. He testified the cattle had good genetics, will gain weight, and will bring "top dollar". He did not quantify a dollar premium debtors' livestock would bring over average quality.

14. The bank also inspected debtors' livestock. Debtors did not attend the inspection. Instead, debtors had their neighbor appear. The neighbor did not allow the bank to inspect all the livestock, purportedly at debtors' direction. The bank officers could account for 78% of the cows. The bank found the livestock they inspected in good condition, but not exceptional.

15. Mr. Hilpipre valued the cows based upon age, ranging from $1,800 per head for three-year old cows to $1,200 for older cows. He consulted with Superior Livestock, an on-line seller in Oklahoma City to determine values. Hilpipre did not check prices at local sale barns because livestock can be moved and sold in other markets.

16. The bank did not determine the ages of the cows. It used a value of $1,000 each for all cows, based upon averages from three local sale barns. At local sale barns, high quality three-year-old cows were selling for $250 to $300 less per head than Mr. Hilpipre opined. The bank's officers have not seen cattle sell for $1,800 locally. The other objecting creditors did not offer evidence of value.

17. The court accepts debtors' younger cows are worth more than the older. However, the ages are evenly distributed, with over half of them five years or older. Under the circumstances, the court finds the bank's valuation methodology acceptable. In its brief, the bank conceded the cows to be worth $506,000, which equals just under $1,100 per cow. This puts the total livestock value at $783,200.[1] The court does not accept Mr. Hilpipre's valuation because he did not obtain local values and could not account for the additional cost to move cattle to higher market areas.

18. Mr. Raymer owns land jointly with Michael Raymer worth $458,000. Debtors contend this land increases the equity cushion. However, this land does not secure debtors' obligations, but only Michael Raymer's. The court inquired whether debtors would offer equity in the land as adequate protection. Debtors declined. As such, the land does not improve the equity cushion and does not constitute a replacement lien.

---

[1] For the reasons stated herein, including the lack of periodic payments and unlimited duration for the use of cash collateral, the court is not convinced that even if the cattle were valued at $949,800 it would justify granting debtors' motion.

19. The amount of cash and cash collateral debtors possess is not clear. The testimony and exhibits did not clarify matters. Mrs. Raymer handles debtors' finances but was not present to testify. Mr. Raymer answered some questions, but could not answer several regarding cash, cash collateral, or pre- and post-petition expenditures. Based upon Mr. Raymer's testimony, it also appears that some of the expenses for which debtors sought to use cash collateral were already paid, including pasture rent.

20. As to the amount of cash collateral available, debtors assert in their motion they have $328,828.01 total. This includes $280,752.70 in uncashed checks from the sale of livestock, $39,159.38 on deposit from corn sales, and $8,915.93 from crop insurance. Debtors also have $53,310 which they contend is not cash collateral, which is the subject of an adversary proceeding against the bank. (Doc. #66).

21. It is not clear whether debtors have other cash available. Debtors' Chapter 12 plan filed as of the date of the hearing provides that debtors' have $457,000 on hand as of December 7, 2020. (Doc. #84-11). Mr. Raymer could not account for the entire cash discrepancy between the motion and the plan.

22. Mr. Raymer has an extensive history with cow/calf operations, farming, and harvesting, with which he has been involved since 2001. Debtors' sole income is from their agricultural operations. Their lack of access to cash collateral has caused personal and operational difficulties. He desires to use cash collateral to pay ongoing expenses, leases, feed, and family bills. He also plans to use cash collateral to expand his cattle operations.

23. There was some discrepancy as to the amount of cash collateral debtors request to use. On direct examination Mr. Raymer requested the amounts stated in the motion. Under cross examination, Mr. Raymer testified he wanted to use all cash collateral. Debtors' counsel affirmed the amount was within debtors' motion. However, debtors could not fully fund operations in 2021 if they used all $328,828.01. They would need to sell additional collateral including livestock.

24. Mr. Raymer offered periodic payments to the secured creditors as adequate protection only as provided in his proposed plan. Therein, debtors propose in March 2021 to pay the objecting secured creditors interest-only payments totaling $43,290. They propose no further payment until March 2022, when they propose to pay $197,883 total to secured creditors. They propose the same payment in March 2023.

25. At trial, Mr. Raymer offered a lien on post-petition crops and livestock, but he could not value these items. Debtors did not present a budget or cash flow projections. In addition, historically debtors used a portion of crops to feed livestock, which reduces the value of a post-petition lien. Mr. Raymer also offered liens against fifteen titled motor vehicles, which Hilpipre values at $104,500 (Doc. 67-2 through Doc. 67-16).

## Conclusions of Law

*Motion to Use Cash Collateral*

A debtor in possession may not use cash collateral unless "each entity that has an interest in such cash collateral consents" or the court authorizes such use after notice and hearing. 11 U.S.C. § 363(c)(2). Upon the request of an entity with an interest, the court must prohibit or condition use of cash collateral as necessary to provide the creditors adequate protection. *Id.* § 363(e). The creditors have the burden of proof on issues of the validity, priority, or extent of their liens. *See id.* 11 U.S.C. § 363(p). The debtor has the burden of proof on the issue of adequate protection. *See id.* In cases where cash collateral is consumed the standard for determining adequate protection is strict. *See In re Polzin*, 49 B.R. 370 (Bankr. D. Minn.1985).

"The purpose of adequate protection is to guard the secured creditor's interest from a decline in the value of the collateralized property." *Gess v. Randolph Brooks FCU (In re Gess)*, 526 B.R. 798, 801 (B.A.P. 8th Cir. 2015). An adequate protection proposal should "as nearly as possible under the circumstances of the case provide the creditor with the value of [its] bargained for rights." *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland),* 16 F.3d 552, 564 (3d Cir. 1994). "The issue of adequate protection is a question of fact." *TLP Servs. v. Stoebner (In re Polaroid Corp.)*, 460 B.R. 740, 742 (B.A.P. 8th Cir. 2011).

When the court considers cash collateral motions and adequate protection, it must:

> (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value….

*Martin v. United States (In re Martin)*, 761 F.2d 472, 476-77 (8th Cir. 1985).

In a Chapter 12 case, adequate protection is governed by 11 U.S.C. § 1205 and can include periodic cash payments, additional or replacement liens, reasonable rent, or such other relief that adequately protects the value of property securing a claim. Debtors offer only interest-only periodic cash payments, the bulk of which begin in 2022. Debtors contend adequate protection exists because the secured creditors have a "mammoth" equity cushion.

> The "equity cushion" is the amount by which the value of the collateral exceeds the liens—equity—which will operate as a shield to protect the creditor's interest—cushion—if the property value declines during the bankruptcy case. Whether the measure of the equity cushion is sufficient to provide adequate protection is ultimately decided on a case-by-case basis.

*In re Panther Mountain Land Dev., LLC*, 438 B.R. 169, 190 (Bankr. E.D. Ark. 2010) (citations omitted). An equity cushion, if sufficient, can constitute adequate protection. *See In re Polaroid Corp.*, 460 B.R. at 744 n. 9 (B.A.P. 8th Cir. 2011); *see also In re Fischer*, No. BK08-40125-TJM, 2008 WL 583444, 2008 Bankr. LEXIS 581 (Bankr. D. Neb. Feb. 28, 2008) (authorizing use of $22,000 of cash collateral to pay crop insurance premiums and farm operations when bank had equity cushion of approximately $200,000).

Debtors failed to meet their burden to establish a sufficient equity cushion. The total value of all secured debt as of the date of the petition, including the estimated real estate taxes, is $3,459,448. The total value of all non-cash collateral is $3,327,450.[2] Debtors assert there is $328,828 in cash collateral, for a total collateral position of $3,656,278. The secured creditors are, collectively, over-secured by $196,830, which is their equity cushion.[3] The equity cushion is 5.69% of the total debt.[4]

The secured creditors suggest the court should discount the collateral value due to liquidation costs. The bank officers testified a 5% real estate commission was standard, the livestock should be discounted 20%, and the equipment 25%. These discounts reduce the equity position by $398,703 and eliminate it. Liquidation value does not appear appropriate in this case for purposes of the motions. The collateral is primarily non-cash. The unsecured creditors will incur liquidation costs whether a liquidation occurs immediately or at some point in the future. There was no evidence that liquidation costs would increase in the future or put the equity cushion at additional risk.

As to the amount of cash collateral requested, the objecting creditors focus on Mr. Raymer's testimony that he wanted to use $328,828.01, which is all available cash collateral. Mr. Raymer and his counsel appeared at odds regarding the amount of cash collateral debtors were seeking. The court will not consider allowing debtors to use all cash collateral.

In their motion, debtors request to use $81,529 to pay expenses from the petition date through November 30, 2020, including $77,797 to operate their farm. They request to

---

[2] This does not include attorney fees to be paid to over-secured creditors, the $49,000 in interest Mr. Korkow calculated, or additional post-petition interest.

[3] Using debtors' methodology, including cash collateral, but not considering post-petition interest or attorney fees, FSA's claim appears likely to be fully secured with its second position lien against the real estate. The bank claim is over-secured by $542,022, AgroLiquid's by $348,125.23, and the SBA's claim by $196,830. The SBA's equity cushion is 130% of its debt.

[4] While debtors focus on individual equity cushions, the overall equity cushion is more appropriate. AgroLiquid and SBA have liens on livestock and equipment junior to the bank. Interest on senior debt and attorney fees for senior creditors significantly impact the junior creditors' equity cushion.

use $13,343 per month thereafter until a Chapter 12 plan is confirmed. Therefore, through February 2021, debtors seek to use $121,558 of cash collateral, with additional erosion of the equity cushion each month thereafter.[5] The court cannot approve the amount debtors request in their motion because debtors failed to meet their burden of proof and given the inconsistencies in the evidence.

There is a significant discrepancy between debtors' motion and plan regarding the amount of cash debtors have on hand, and how much cash constitutes cash collateral. In their motion, debtors assert they have cash collateral of $328,828.01, plus $53,310 which is subject to dispute with the bank, for a total of $382,138.01. Debtors filed their motion on November 30, 2020. Debtors' proposed plan filed seven days later provides debtors have $457,000 of cash on hand as of December 7, 2020. Mr. Raymer could not explain the discrepancy of $74,861.99 in cash. He also could not answer why such funds, if they exist, could not be used in the short term before cash collateral. In addition, he already paid some post-petition expenses. It is not clear whether debtors are seeking reimbursement for those expenses, which the court is hesitant to do under the circumstances.

In addition, debtors' need for cash collateral clearly extends well beyond the $121,558 requested because debtors did not obtain or seek financing for 2021. The cash collateral requested will not fund their operation, nor will the entire $328,828 in cash collateral. If debtors cannot confirm a Chapter 12 plan, they will be forced to request to use additional cash collateral. Under the circumstances, debtors should demonstrate they have a reasonable chance to successfully reorganize.

Debtors offered no evidence to support their efforts to reorganize. They did not offer a budget or cash flow projections. As to repayment to creditors, the plan filed at the time of hearing proposes payments on March 31, 2021 totaling $43,290 to the objecting creditors, except for SBA, which was not included. The next proposed payments to these creditors are regular plan payments totaling $197,883, with the first payments due on March 22, 2022. Based upon their plan, debtors seek to use at least $121,558 in cash collateral, and more likely $328,828 eroding any equity cushion, with interest-only payments to secured creditors. The court cannot approve this as part of a motion to use cash collateral.

Debtors' proposed use of cash collateral for over two years does not protect against the risks to the secured creditors. Not including cash, debtors' livestock constitutes approximately 25% of the collateral value and the equipment 17%. Livestock is subject

---

[5] Even on an individual basis, through February 2021, debtors propose to erode SBA's equity cushion from 130% to 50%, with 8.9% erosion each month thereafter, not including additional post-petition interest on a significant amount of secured debt, or attorney fees.

to death loss and market volatility. Equipment is subject to use, depreciation, and destruction.

Debtors' request as stated in the motion rapidly erodes the equity cushion because it is open-ended. Further erosion is likely because debtors require additional cash collateral and must sell additional livestock. "Where an equity cushion is insufficient in size or likely to erode, it cannot, standing alone, constitute adequate protection." *Sharon Steel Corp. v. Citibank, N.A. (In re Sharon Steel Corp*.), 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993). Debtors' offer of $104,500 in titled vehicles does not change the analysis as it does not provide the creditors the value of the rights for which they bargained. The cost to repossess, store, and sell fifteen individual vehicles are substantially different than the rights they have in cash or in land, farm products, and farm equipment.

The court is not open to funding debtors' 2021 operations indefinitely through a cash collateral motion. The court is willing to consider a shorter-term use of cash collateral while debtors work to get a plan confirmed. The court will consider two-months of cash collateral if debtors file:

- An amended motion for which new notice per Local Rule 9013-1 is not required.

- A proposed budget for cash collateral over the next two months, which should not include any expenses already paid.

- A statement of the projected value of replacement liens on livestock and crops, not including crops that will be fed to livestock, and the basis for the calculation.

- An accounting of all cash and cash collateral from the date of the petition to present along with a reconciliation of the $328,828.01 provided in the motion at Doc. #66 and the $457,000 provided in the plan at Doc. #84-10.

- All monthly bank records since the inception of debtors' case.

*Motion to Transfer Cash Collateral*

The bank's motion for an order requiring debtors to transfer cash collateral is filed pursuant to 11 U.S.C. § 363(e), which provides:

> [O]n request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

*Id*. § 363(e). The bank did not file a motion for relief pursuant to § 362(d). Because the court is not authorizing the use of any cash collateral in this order, the bank's motion for transfer is denied.

If debtors file an amended motion to use cash collateral, the court will consider conditioning debtors' use of cash collateral on debtors' making an adequate protection payment to the bank, including transfer of the cash collateral. Depending on the amount of cash collateral requested, and based upon the values, a payment to the bank per § 363(e) may be necessary.

IT IS THEREFORE ORDERED:

1. Debtors' motion to use cash collateral (Doc. #66) is denied subject to debtors filing an amended motion.

2. Security First Bank's motion for transfer of cash collateral (Doc. #55) is denied. If debtors file an amended motion, the court will consider requiring a periodic payment or transfer of cash collateral as adequate protection.

Dated: February 10, 2021.

BY THE COURT:

/s/ Brian S. Kruse
Brian S. Kruse
Bankruptcy Judge

Notice given by the Court to:
* Vincent Ledlow
* David Pederson
Richard Garden
Douglas Semisch

Movant (*) is responsible for giving notice to other parties if required by rule or statute.